McDANIEL et al. v. GEORGIA CONSOL. CONTRACTING CO.

No. 595.

United States District Court
S. D. Georgia, Savannah Division.

May 12, 1952.

Kennedy & Bulloch, Manchester, Ga., for plaintiff.

Myrick & Myrick, Savannah, Ga., for defendant.

**SCARLETT, District Judge.**

This cause comes on before the Court on written exceptions filed by Counsel for the defendants to the findings of a Master, Mr. J. Allen Tison, appointed by an order of this Court, dated February 12, 1952. This order stipulated that the Master should hear and determine the issues of fact that might arise in the case under the pleadings and under the evidence, and further, that "any questions of law that may arise on the hearing before said Master shall be certified by the Master to the Judge of this Court, and there determined."

It appears from the Master's report and from the pleadings and from the evidence, both oral and documentary, that this was an action by the McDaniel Construction Company against the defendant, upon a written contract which was in the nature of a sub-contract for work to be done for the Corps of Engineers of the United States Army on certain buildings at Camp Stewart, Georgia, an Army Post.

This sub-contract was not for any specified amount of money. It merely fixed unit prices for various repair jobs on old buildings at Camp Stewart, a military reservation of the Government. The exact work and the amount therefor was, under the pleadings and under the evidence, to be designated by the Inspectors of the Government under the Chief Inspector, J. G. Keller, and was to be approved by these Inspectors.

It further appears that the defendant, the Georgia Consolidated Contracting Company, Incorporated, had a general written contract with the Corps of Engineers, U. S. Army for a large amount of work at Camp Stewart, and that by sub-contract it let a portion of the work to the plaintiffs. An examination of this sub-contract discloses

that it is on a printed form used by the City of Atlanta, Georgia, and used words such as "Architect" and "Owner," which do not very well apply to the actual parties to the contract.

There appears in the body of the contract certain words, typewritten, some of which are as follows: "Work to be conducted in each building as approved by the Officer in Charge * * *. Any additional items to be authorized by the Contracting Officer other than shown in the Schedule Breakdown will be based on a unit price figure and approved by the Contracting Officer."

Then in a printed paragraph of the contract, as appears in Item 4, it is stipulated "that all work shall be done in a good and workmanlike manner and shall be subject to the inspection, approval and acceptance of the contractor." After that, the following words appear, typewritten: "Corps of Engineers, U. S. Army." There then follow these words, "The approval and acceptance of such work performed by said subcontractor shall be left to the decision of: First, the contractor; second, the architect, and third, the owner."

■ It is settled law in interpretation of contracts that "where parts of a contract * * * are in writing and other parts * * * are printed, the parts in writing are to be given the greater weight", Shackelford v. Fitzgerald, 151 Ga. 35, 105 S.E. 597, 599. And further, that "a clause written [on the face of a contract] inconsistent with one printed upon the back will generally be accepted as expressing the intention of the parties". Caddick Milling Co. v. Moultrie Grocery Co., 22 Ga.App. 524, 96 S.E. 583. And further, the "Written portion of contract prevails over printed portion, where it cannot be reconciled therewith." Capital Wall Paper Co. v. Callan Court Co., 38 Ga.App. 428, 144 S.E. 135.

The Master in his written report found that the McDaniel Construction performed work upon various buildings at Camp Stewart under a contract aggregating the sum of $61,175.76, according to written invoices which were attached to the original petition of the plaintiffs and which were identified by the defendant and introduced in evidence, numbering 165, and these invoices were numbered from one to 165 inclusive, and each one specified the amount of work done and the price therefor, and the date on which the invoices were rendered, the invoices being weekly; from September 29, 1950 to the 19th of January, 1951. Included in the above figures the Master also found that the defendant owed the plaintiffs three items for overtime to employees to difference of rate of pay on roofers in two instances, the invoices being Numbers 163, 164 and 165, and being rendered on the dates specified, $317.44, $284.60, and $255.15 respectively.

The Master further found and reported that on this amount of $61,175.76, the defendant had paid the plaintiffs $55,965.76, which left a balance due under the contract of $5,210. He further found that the defendant admitted paying plaintiffs the sum of $55,965.76, and that after making allowance for a certain credit admitted by the plaintiff to be due the defendants, he found and ruled that the defendant owed the plaintiff the sum of $5,034.76, with interest from April 1, 1951, at the rate of seven (7) per cent per annum.

He further reported that the Official Stenographer who transcribed the evidence rendered a bill for $160, and he requested that the Judge of this Court assess the bill of the said Reporter, F. B. Thigpen, as a part of the costs in the case, and that the Court fix the compensation of the Master.

To these findings the defendant filed certain written exceptions within the time provided by the Rules of Civil Procedure, 28 U.S.C.A. The principal ground of the exceptions was that the work had not been approved by the Corps of Engineers of the United States Army, as provided in the contract, and that the burden of proof was upon the plaintiffs to show by evidence that all of the work which plaintiffs contended they had performed had been approved in the manner provided in the contract.

The Master further found that all of this work had been approved by the Officer in Charge, as set forth on the first page

of the contract, in typewriting, and it also had been approved by the Corps of Engineers, U. S. Army, if that portion of the contract, which in typewriting on page two of the printed contract, applied. The Master's reasons for so holding were that the authorization for the work to be done upon various buildings of various types was made by J. G. Keller, Chief Inspector of the Corps of Engineers, U. S. Army, and his assistants—Frank Wood, Alvin T. Linton, and Cribbs, it appearing from the Master's report that J. G. Keller was still in the employ of the United States Government. The Master then reported that all three of these Inspectors testified and verified verbatim Mr. McDaniel, Sr.'s testimony to the effect that all of the work appearing on the invoices of the McDaniel Construction Company was authorized by these Inspectors and approved by them.

The Master held and so reported that these Inspectors were the duly authorized representatives of the Officer in Charge and of the Corps of Engineers of the United States Army.

While the Master reported that one of the Inspectors did not testify, to-wit, Mr. Cribbs, his report shows that Mr. Keller, Chief Inspector, identified all of the invoices which covered work which Cribbs had inspected, and Mr. Keller placed his initials on these invoices, and testified positively that he knew the work had been done and approved.

In his report the Master used the following language: "In the opinion of the Master, these Government Inspectors represented not only the Contractor himself but the Army Engineers under the terms of the contract. It did not appear from the evidence that the Contractor himself had any inspection made of the various pieces of work which the plaintiffs performed. It is clear from the evidence that these Government Inspectors pointed out the work on the various buildings which the plaintiffs were to perform under their contract, and saw it done, and approved it. This will also apply to extra work which was performed." The Master also reported: "It nowhere appears in the evidence that at the time these invoices were submitted by the plaintiffs there was any exception made by the Georgia Consolidated Contracting Company or by the Area Engineer." Mr. Keller testified, on page 44 and 45 of the record, "that only in a half dozen instances had there been any recheck by a representative of the defendant and the Area Engineer, and that no change had been made."

The Master further reported: "The Master determines that if the Georgia Consolidated Contracting Company or the Area Engineer of the Army did not see fit to check on the invoices of the plaintiffs and the written report of the Government Inspectors made at the time the work was done, it would not lie, either with the Georgia Consolidated Contracting Company or the Area Engineer to contend that the work was not done, after the entire contract was finished."

The Master further reported: "Moreover the Master finds that the Government Inspectors represented not only the Georgia Consolidated Contracting Company, but the Area Engineer, and that when these Inspectors approved the work it was the same thing as a matter of law and as a matter of fact as if the Georgia Consolidated and the Area Engineer and themselves inspected the work and approved the same.

The exceptions filed by the defendant contend that the foregoing report of the Master was erroneous as a matter of law, and that there was no evidence whatsoever to sustain the Master's finding, and that it was not an issue of fact which the Master determined.

From the following excerpts from the transcript of the oral testimony, the Court finds that there was ample evidence to sustain the Master's findings, that these Inspectors represented the Contracting Officer, "the Officer in Charge," and also the Corps of Engineers of the United States Army."

Mr. Keller, the Chief Engineer testified as follows, as appears on pages 32 and 33 of the evidence:

"The Court—

"Who was that left in the discretion of?  Did the Inspector authorize it be-

fore the work was done? A. The Inspector could not authorize it unless it came from Mr. Hearne, the Area Engineer; Mr. Keller, the Project Engineer or myself.

"The Area Engineer, the Project Engineer at that time, Mr. Howell Kelley, told us to use our discretion when it did not require a large amount of money; I mean a large outlay of money;—that we use our own discretion as to the work to be done, that was the Inspector."

On page 34, Mr. Keller testified as follows:

"Q. In the presence of Mr. Vandergriff and Mr. McDaniel, did Mr. Kelley not say, 'Disregard work orders in case it could be repaired, rather than done as a whole; and to save money wherever it could be saved.' A. Yes, he did."

On page 44, Mr. Keller further testified as follows:

"Q. Now, one more question I want to ask you: After you inspected a building and approved it, was that subject to anybody else's approval? A. Yes, sir.

"Q. Or was that final? A. It was subject to the acceptance of—by the Area Engineers.

"Q. Well, did he actually, after you went out and inspected a building, did he go out in the field and make another inspection? A. No sir. He accepted my report."

In this connection, the evidence fails to show that there was any instance where the Area Engineer disapproved of any of Mr. Keller's approvals or the approvals of any of the Inspectors under Mr. Keller.

Furthermore, it does not appear that any one contradicted Mr. Keller's statement to the effect that the Area Engineer accepted his reports.

It is quite evident, from reading the evidence, that it was physically impossible for the Area Engineer or the representative of the Corps of Engineers of the U. S. Army to go out and inspect the immense amount of work which was done upon various buildings, or to point out what work was to be done. It is evident from this record that not only were the Inspectors to designate the particular work to be done by the McDaniel Construction Company, but that they were to approve it, and had the authority to approve it. It further appears that these Inspectors turned in daily reports along with the invoices made out by McDaniel, and that McDaniel made his invoices word for word from the reports of the Inspectors, and that this system continued from September 20, 1950 until January 19, 1951, and that at no time was there any disapproval of any of the McDaniel invoices or of any of the reports of the Inspectors.

Certain it is that there must have been an approval of invoices to the extent of $55,965.76, which was the amount the defendant paid the plaintiffs on these invoices. If the invoices aggregating that amount had not been approved, certain it is that the Government would not have paid the Georgia Consolidated, and the Georgia Consolidated would not have paid the plaintiffs. There is not a line of evidence from the defendant that there was any disapproval by the Government or by the defendant of the amount of work which aggregated $5,210.

This Court is of the opinion that after McDaniel had proved by his own testimony and the testimony of the Inspectors, that all of the work had been performed to the extent of $61,175.76, of which he had been paid $55,965.76, the burden shifted to the defendant to prove what particular items aggregating $5,210 had not been approved.

This Court is further of the opinion that even without the Inspectors having testified as to the authorization of the work by them and the approval by them of the work, the burden shifted to the defendant, after McDaniel positively swore that he had performed all of the work under the inspection and approval of the Inspectors. In other words, this Court is of the opinion that any contention by the defendant

that any part of the work done by McDaniel had not been approved by the Contracting Officer or the Officer in Charge, or the Corps of Engineers of the U. S. Army, was a matter of defense, and that the burden was on the defendant to show that the plaintiffs had not complied with their contract.

■ The defendant introduced in evidence a bulky document, which on its face stated that it was a Payment Estimate-Contract Performance—Georgia Consolidated Contracting Company. The period covered by this Estimate was 1/26/51 to 2/25/51. This document was introduced by the defendant for the purpose, supposedly of showing that it paid McDaniel Construction Company all that was due that Company. However, the record shows that McDaniel Construction Company began on September 20, 1950, and finished January 19, 1951. Therefore this "Payment Estimate—Contract Performance" would seem to be utterly immaterial, and the Master was right in regard to it, for this and reasons which he stated.

■ It is significant, however, that this "Payment Estimate," on the page, submits a claim to the Government for $255.41 stating "that the change in rates was made by the Department of Labor in a Wage determination pursuant to the Davis-Bacon Act." This is one of the claims that Counsel for the defendant in his exceptions stated that the plaintiff was not entitled to recover, and yet, as the Master determined, the defendant was making a claim against the Government for this same amount and for the same thing. The other two claims for overtime or difference in wages, which McDaniel submitted were based upon express directions from the Superintendent of the Georgia Consolidated Contracting Company at Camp Stewart: The Master was therefore right in holding that these three claims should be paid.

■ All of the evidence indicates that the work performed by the McDaniel Construction Company, as evidenced by the invoices submitted, was pointed out and required by the Government Inspectors, and that the Government Inspectors approved it. The Master found, as a matter of fact, that there had been an express approval by the Corps of Engineers or the Contracting Officer, as well as by the representative of the Georgia Consolidated Contracting Company, or there had been an implied acceptance by these Officials, on account of the fact that they had never at any time disapproved any of the invoices, and had paid substantially all of them except the amount for which the McDaniel Construction Company is suing. There was no evidence before the Master from defendant's standpoint, that the claims which were covered by this $55,965.76 had not been approved by the officers designated in the contract, and the presumption of fact therefore is that the claims aggregating $61,175.-76 were approved by the proper Officials, just as nine-tenths of the claims had been approved, for which payment had been made in the sum of $55,965.76.

■ Counsel for the defendant admitted before this Court that he was not appealing from or excepting to the findings of the Master on the question of issues of fact. The Court is of the opinion that the findings of the Master were all issues of fact, and that he was correct in his findings, and that the same were amply supported by the evidence under Rule 53 of Rules of Civil Procedure with reference to Masters' Reports, where it is provided, "In an action to be tried without a jury the court shall accept the * * * findings of fact unless clearly erroneous."

The Master's findings are therefore approved, and judgment is rendered in behalf of the McDaniel Construction Company against the Georgia Consolidated Contracting Company, for the sum of $5,-034.74, with interest from the first day of April 1951, and judgment is also against the defendant for all costs of Court, including the sum of $160 as the cost of reporting and transcribing the evidence in said case before the Master by F. B. Thigpen. Judgment is also rendered against the defendant in the sum of $200 as compen-

sation for J. Allen Tison, Master in said case, which is the amount allowed by this Court to the said Tison as compensation for his acting as Master under the order of this Court, to be taxed as Court costs.